FREDERICK BROWN

*v.*

NATHAN D. PANCOAST et al.

A testator appointed two executors, and named two others to act in case of the death or declination of the former, with authority in the survivor to nominate a co-executor with full power to exercise the same discretion in the management and disposition of the estate as the original appointees possessed. He gave to his two sisters, for their joint lives and that of the survivor, as a residence, his real estate in M., called "the Cottage," with the appurtenances, lands &c., with a gift over to his executors as trustees, to sell the premises and to invest the proceeds and apply the income to purchasing books and founding a useful public library in or near M.

The executors have all died without nominating any associates, testator's sisters are both dead, and a legal organization in M. has established a public library.

On application of the heir at common law of the last surviving executor—*Held*, that he would be directed to sell the premises in M., including a wharf two hundred yards distant from "the Cottage," but bought solely for the use of, and always used by the testator solely in connection therewith, and to pay over the proceeds to the library already existing at M., as trustee; and, further, that the executor's failure to designate a co-executor would not destroy the charity.

Bill for construction of will and directions.    On final hearing on pleadings and proofs.

*Mr. F. B. Lewis* and *Mr. B. Gummere*, for complainant.

*Mr. D. J. Pancoast* and *Mr. J. Wilson*, for the heirs of Nathan Dunn.

*Mr. C. E. Merritt*, for the Burlington County Lyceum.

THE CHANCELLOR.

Nathan Dunn, late of Philadelphia, deceased, died in 1844. By his will, made in 1840, he provided as follows:

Brown *v.* Pancoast.

"I nominate and appoint Frederick Brown and William B. Langdon executors of this my last will and testament. If either of these persons should die, remove or resign his executorship, then I nominate Richard Price, of the city of Philadelphia, an executor in his place; and if both of these persons should die before me, or cease, as aforesaid, to be, my executors, then I nominate Lewis Waln, of the city of Philadelphia, an executor, together with the said Richard Price. If only one of the said four persons should be living at the time of my death, and no provision be made by myself for another executor, then I authorize such one of the above-named four persons to name a co-executor; and whenever, at any time, one of my executors for the time being shall die, renounce or resign, and his place shall not be supplied by the above provisions, designating one of the four persons named, then I authorize and desire the surviving or remaining executor to nominate and appoint a co-executor, and so often as such vacancy may occur. I hereby give to such person and persons so to be appointed an executor or executors all the power and authority conferred by the nominations made by myself."

By a codicil made in 1841, he substituted Charles Roberts for William B. Langdon, and by another one, made in the same year, substituted Isaac Collins for Roberts. By the will, he gave to his two sisters, Phebe and Rhoda Osborn, for their joint lives and the life of the survivor of them, the free possession and use of his real estate in Mount Holly, in this state, called "the Cottage," as a place of residence, together with the appurtenances, lands, improvements, fixtures and furniture, and then proceeded as follows:

"When the same shall be vacated by the death of the survivor of them, or by the voluntary relinquishment thereof by the survivor, or both of them, I devise the said real estate and every part thereof, with the appurtenances, lands, improvements, fixtures and furniture therein and thereunto to me belonging (excepting, always. such parts of the furniture and other articles of personal property as may be designated by the said Phebe Osborn and Rhoda Osborn as belonging to them, which they, or the survivor of them, shall receive), to my said executors or trustees, their heirs, executors, administrators or assigns, in trust, to dispose thereof at public auction, after fully advertising the same, and to make good and sufficient title or titles to the purchaser or purchasers in fee simple or otherwise. In making such sale, the said executors (as trustees) are hereby authorized and empowered to divide the property and sell and convey portions or parts of the land in lots or parcels, or to dispose of and convey the whole together, as to them may appear most eligible. I give and bequeath $2,000 of the proceeds of such sale or sales to the said Phebe Osborn and Rhoda Osborn and the survivor of them, on the event of their or her vacating the premises during their joint lives, or

the life of the survivor; and I give and bequeath the rest and residue of the proceeds of such sale or sales to my executors in trust, to invest the same in good securities, and to apply the interest and income of such investments, from time to time, in the purchase of books and in forming a useful library, to be opened in some appropriate and well-situated institution in or near Mount Holly, to be kept open during such hours and times as may be most convenient and useful for the persons for whose use it is designated. It is my will that the said library may be devoted to the use of persons residing in and about Mount Holly, generally, and more particularly to the use and benefit of young men and apprentices. I authorize my said executors to adopt and carry into full effect such plan of organization and arrangement as may give the most efficacy to this project, comprehending, if they think proper, a lyceum. If they should appoint a board of trustees, I desire that such board may be composed of persons who reside in or near Mount Holly, and that such arrangement may carefully be made as will best appropriate the funds and preserve and perpetuate the uses of them herein expressed or contemplated."

Of the executors appointed by the will, only Mr. Collins and Mr. Brown accepted the trust. The former died January 15th, 1863, and the latter, February 27th, 1864. Waln died December 20th, 1863, and Price July 8th, 1865. No appointment to fill any vacancy in the executorship was ever made. Phebe and Rhoda Osborn occupied the property given to them by the above-mentioned provision of the will, together, after the testator's death until the death of Phebe, which occurred in 1855, and Rhoda occupied it from that time until her death, which took place in May, 1880. The cottage stands on a tract of about twenty-five acres. The testator owned a wharf-lot distant about two hundred yards from it, which he bought for use in connection with it as a place on which to land lime, marl &c. The bill is filed by the eldest son and heir at common law of Frederick Brown, who survived his co-executor, Collins, to establish his claim as such heir to the title to the property, subject to the trust, and his right to sell it and administer the trust out of the proceeds of the sale, and for direction to administer it through the agency or instrumentality of the Burlington County Lyceum of History and Natural Science, which is an incorporated literary institution in Mount Holly, and is by its charter authorized to maintain and does maintain a circulating library. The bill is filed against the heirs-at-law and next of

kin of the testator, and the corporation just mentioned is also made a party.

That the purpose to which the testator devotes the proceeds of the sale of the property is a charitable use is entirely clear. He gives them to his executors, in trust, to invest them in good securities and apply the interest and income of the investment from time to time in the purchase of books and in forming a useful library, to be opened in some appropriate and well-situated institution in or near Mount Holly, to be kept open during such hours and times as may be most convenient and useful for the persons for whose use it is designated, and he adds that it is his will that the library may be devoted to the use of persons residing in and about Mount Holly generally, and more particularly to the use and benefit of young men and apprentices. This is a gift for the advancement of useful learning, and such gifts are said to be the most meritorious that can be bestowed, because they afford the means of educating great natural abilities which may be employed for the benefit of the whole community. *Shelford on Mortmain 68.* It is within Mr. Justice Gray's definition of charity, in a technical sense:

"A gift to be applied consistently with existing laws for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education and religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves for life, or by erecting and maintaining public buildings or works, or otherwise lessening the burdens of government."

Such gifts as this have been expressly held to be legal charities. *Mason's Exr.* v. *Meth. Epis. Ch., 12 C. E. Gr. 47; Goodell* v. *Union Association, 2 Stew. Eq. 32; De Camp* v. *Dobbins, Id. 36; Drury* v. *Natick, 10 Allen 169; Fairbanks* v. *Lamson, 99 Mass. 533; Pickering* v. *Shotwell, 10 Pa. St. 23.* But it is insisted on the part of the heirs of the testator that the gift is void, because discretion is to be exercised in the selection of the books to be purchased and the place where the library is to be kept, and that discretion was lodged by the testator in the executors named by him and their appointees, and, since those he

designated are all dead and appointed no one to succeed them, the trust has therefore failed. But the gift here is to a designated charity, one which the court can execute; and in such case the trust will be upheld. *Moggridge* v. *Thackwell, 7 Ves. 36 ; Mills* v. *Farmer, 1 Meriv. 55, 100.*

" Where," says Lord Eldon, in the latter case, " the testator has sufficiently denoted that charity is his legatee, the court will consider charity as the whole substance of the legacy, and in such cases only, will provide a mode by which that legatee shall take, but by which no other than charitable legatees can take."

The testator himself, it may be observed, did not rely upon the discretion of his own appointees to administer the trust. He gives the executors power to deliver over the administration to others, strangers; for he authorizes them to appoint a board of trustees to administer the charity, simply expressing his desire that the board be composed of persons residing in or near Mount Holly, and that such arrangements be made as will secure the best appropriation of the funds and preserve and perpetuate the uses for which the charity was designed. Says Mr. Perry in his work on Trusts :

"If a donor makes a gift in trust for a particular charitable purpose, as to establish a particular school, hospital, asylum or other charitable institution, and appoints no trustee, or the trustee appointed by him is incapable of taking the gift and of acting in that behalf; or if the trustee dies before the testator or declines to act; or if trustees are named or appointed who are not *in esse,* but are to come into existence thereafter, as by an act of incorporation, courts of equity, in the exercise of their ordinary jurisdiction, can establish the charity ; for it is their invariable practice not to allow a legal and valid charity to fail for want of a trustee. Therefore courts will appoint trustees in such cases to take up and carry out the clear purposes of the donor, and they will order the heir or legal representatives to hold the fund upon the declared trust until trustees can be appointed to execute the trust as contemplated." *Perry on Trusts ? 722.*

The fact that the executors who proved the will did not appoint will not defeat the trust, but the court itself will appoint. In *Foley* v. *Wontner, 2 J. & W. 245,* by a trust deed (of a meet-

ing-house), power to fill vacancies occurring among the trustees
and committees, to whom the control and regulation of the affairs
of a congregation were committed (there were to be five commit-
tees and thirteen trustees), was given to the surviving trustees
and committees, and from time to time, on the appointment of
new trustees, proper assignments were to be made; the lord chan-
cellor (Eldon) said:

> "In such a case, unless it differs from all other trusts, the court would fill
> up the number, referring it to the master to appoint proper persons, and when
> appointed would direct them to carry on the trusts of the deed. Having
> neglected to fill up the vacancies, there is no one now who has any power.
> I apprehend neither the congregation nor any one else can fill them up; it
> must be done by the court."

In *Attorney-General* v. *Floyer*, *2 Vern. 748*, the will appointed
six trustees, and provided that when reduced to three they should
choose others. All having died but one, the vacancies not having
been filled, he filled them. It was held that the provision that
the trustees, when reduced to three, should fill the vacancies, was
directory merely, and that the single surviving trustee had a
better right than any one else to fill the vacancies, and that it
was his duty to do so, and he might well convey to other trustees
appointed by him. In *Attorney-General* v. *Bishop of Litchfield,
5 Ves. 825*, the will directed that the three last survivors of eight
trustees to present to a living thereby appointed should make
choice of new trustees to be added to them successively to present.
By neglect the number was not filled up at the time of an avoid-
ance. Presentation was made by the heir of the last survivor
under his legal title, and the court refused to discountenance the
appointment, and said that the court ought to control the appoint-
ment of trustees, and that it would, at the hearing, refer it to a
master to appoint. See, also, *Tudor on Charitable Trusts 389.*
In *In re Morton and Hallett*, *42 L. T. R. (N. S.) 602*, a testator
devised hereditaments to A and B and their heirs, upon trust that
they or the trustees or trustee, for the time being, of the will,
should make sale thereof; and he declared that if the trustees by
the will appointed, or either of them, or any trustee or trustees

Brown *v.* Pancoast.

to be appointed as thereinafter provided, should die, go to reside beyond seas, or be desirous of being discharged, or refuse or become incapable to act, then and so often the said trustees or trustee (and for that purpose any retiring trustee should be considered a trustee) might appoint any other person or persons to be a trustee or trustees in the place of the trustee or trustees so dying or becoming incapable to act. It was held that the heir of the survivor of A and B could sell, and was not prevented from doing so by the power of appointing new trustees. Wherever circumstances render it necessary or desirable to appoint new trustees, this court, in the exercise of its inherent jurisdiction, will interpose, upon a proper application, and make the appointment; and that, too, whether the instrument creating the trust does or does not contain a power to appoint new trustees. *Hill on Trustees 190; Green* v. *Blackwell, 4 Stew. Eq. 37.*

The fee of the land in question, subject to the particular estate, vested in the executors, Frederick Brown and Isaac Collins, as joint tenants, on their proving the will. *Heater* v. *Van Auken, 1 McCart. 159; Weehawken Ferry Co.* v. *Sisson, 2 C. E. Gr. 475; Graham* v. *Houghtalin, 1 Vr. 552; Rev. 1224.* And on the death of the survivor it descended to the complainant as his heir at common law. *Rev. 1224; Schenck* v. *Schenck, 1 C. E. Gr. 174; Zabriskie* v. *M. & E. R. R. Co., 6 Stew. Eq. 22, affirmed on appeal, 7 Stew. Eq. 282.* Waln was then dead, and Price, though living, would not accept the trust. No title, therefore, vested in him. *Perry on Trusts § 259.*

The Burlington County Lyceum of History and Natural Science was incorporated by a special act of the legislature (*P. L. of 1860 p. 42*), and under a subsequent general law (*P. L. of 1876 p. 262*), has power to establish a circulating library; and, in fact, has now such a library of the value of about $2,500. It appears to be, in all respects, a proper trustee, and is willing to accept the trust. Under the general law just referred to, it is authorized, for the establishment, maintenance and increase of its library, to accept and receive gifts, grants, bequests and devises of real and personal property, by deed, will or otherwise. This trust is within the general scope of the purposes of the corpora-

tion, and it may, therefore, take it; and, if it accepts it, it may be compelled to execute it. *Perry on Trusts* § *43* ; *Mason's Exr.* v. *Trustees &c., 12 C. E. Gr. 47.*

Part of the land has been converted by condemnation proceedings, and the proceeds are in the hands of the complainant. The rest of the property will be sold. The wharf-lot was purchased merely for use in connection with the other property, and was so used accordingly. The testator lived in Philadelphia. He intended the property for a permanent residence for his sisters, and he lived there himself at times, and contemplated making it his own permanent abode. He had no other land in this state. The wharf-lot, as before stated, is about two hundred yards distant from the main property. It is on the creek. There was no railroad when he bought it, and he bought it for use as a convenience to his property to land marl, lime, ashes &c., which he caused to be brought there for use on the property, and he never used it in any other way than in connection with the property. He evidently considered it a parcel of the property. The devise of the particular estate &c., is of his real estate called " ' the Cottage,' together with the appurtenances, lands, improvements, fixtures and furniture ; " and the devise of the remainder is of " the said real estate and every part thereof, the appurtenances, lands, improvements, fixtures and furniture therein and thereunto to me belonging." The testator intended, by the devise of his real estate called " the Cottage," together with the lands &c., to include the lot in question as parcel thereof.

The complainant will be directed to sell if he will (being a non-resident, and therefore beyond the jurisdiction of the court) give security for the performance of his duty in the premises, and pay over the proceeds of the sale, as well as the other money in his hands received from the condemnation, to the Burlington County Lyceum of History and Natural Science, to be administered by it as trustee in his stead.